J-A27013-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: N.S.D., A MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.M., FATHER | : : : : : : | |
| | : | No. 1138 MDA 2022 |

Appeal from the Decree Entered July 13, 2022
In the Court of Common Pleas of York County Orphans' Court at No(s):
2021-0153a

BEFORE:   DUBOW, J., McLAUGHLIN, J., and COLINS, J.[*]

MEMORANDUM BY DUBOW, J.:                **FILED: NOVEMBER 22, 2022**

A.M. ("Father") appeals from the Decree terminating his parental rights to minor child, N.S.D. ("Child").  After careful review, we affirm.

Child was born in March 2020 and suffered withdrawal symptoms due to the prenatal drug addiction of Child's mother ("Mother").  The York County Offices of Children, Youth, and Families ("the Agency") removed Child from Mother's custody soon after her birth.[1, 2]  The court adjudicated Child dependent and granted custody to the Agency on April 7, 2020.  The Agency placed Child in her pre-adoptive kinship foster home in April 2020. Following numerous permanency review hearings, the court changed Child's

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Child's birth certificate does not contain a father's name.

[2] The court ultimately terminated Mother's parental rights.  She is not a party to this appeal.

permanency goal on June 21, 2022, from reunification with a parent to adoption, with a concurrent goal of placement with legal custodian relative.

On July 9, 2021, the Agency filed a Petition to Involuntarily Terminate Parental Rights of Mother ("TPR Petition") and two named putative fathers.[3] However, at the end of July 2021, when Child was nearly 17 months old, Mother provided Father's name to the Agency. Father and Mother had married in 2017 and, although Father had been aware of Mother's pregnancy in 2019, he had had no contact with Mother since September 2019. Father moved to Wisconsin in December 2019. The Agency contacted Father at the end of July 2021, and Father then indicated that he wanted to be a resource for Child.

Father began to pay child support, requested photographs and visits with Child, and sent gifts for Child at Christmas, Easter, and her birthday. Because Child's permanency goal had been changed to adoption in June 2021, Father did not have a family service plan. The Agency and Father had "sporadic" communication, and Father "often would not respond to Agency attempts to contact him."[4] Although Father secured permission from the court to participate in the permanency review hearing in December 2021 via video

---

[3] The court granted the Agency's motion for an order to serve the petition for involuntary termination via publication after Mother and the two putative fathers could not be located for service in person or by mail. Notably, the Agency did not name Father in this TPR Petition because Mother had not identified him yet.

[4] Brief of Appellee and GAL at 12.

conference, Father did not log on or otherwise participate. In addition, Father would not return to Pennsylvania.

On April 20, 2022, the Agency filed an amended TPR Petition, requesting to terminate the parental rights of Mother, Father, and the two named putative fathers. The Agency served Father in Wautoma, Wisconsin, where he then resided under probationary supervision.[5]

On July 13, 2022, when Child was just over 27 months old, the court held a hearing on the termination petition.[6] Mother and the two named putative fathers, each of whom had been served by publication, did not appear. Father appeared via video conference and was represented by counsel. The pre-adoptive parents also appeared at the hearing with Child.

The court heard testimony from Karen Rose, a supervisor with the Agency and Father. The court also admitted the record from the dependency proceedings into evidence. Ms. Rose testified that because the Agency learned

---

[5] Father had pled guilty in December 2017 to a charge of Simple Assault in connection with a September 2017 attack on Child's mother in Lancaster County, as well as drug possession charges and accident involving damage to a vehicle. The court sentenced him to a term of probation in December 2017. N.T. TPR Hearing at 31. Father fled to his home state of Wisconsin when he was released from jail. Ultimately, he returned to Pennsylvania and the Pennsylvania probation authorities allowed Father to move to Wisconsin where his probation is monitored by Wisconsin probation authorities.

[6] Child's guardian *ad litem* also served as Child's legal counsel and the trial court found that counsel's dual status did not present a conflict. **See** N.T. TPR Hearing at 48. The judge who presided at each dependency hearing also presided at the parental rights termination hearing.

of Father's existence only a week prior to the goal change, Father did not have a family service plan prior to or after the Agency was able to connect with him. She also testified that Child had never met Father. Ms. Rose further testified that, although Father had been assessed for $407 per month in child support, he stopped paying on March 1, 2022, and is over $2,000 in arrears. In addition, she stated that Father has never provided documentation as to a lawful source of income or safe, stable, and appropriate housing for himself and Child.

With respect to Child's best interests, Ms. Rose testified that she has observed Child with her pre-adoptive foster parents in their home, which she opined is safe and secure, and that Child refers to her foster parents as "mommy" and "daddy."[7] Ms. Rose further testified that removing Child from her pre-adoptive parents would negatively impact Child because it is the only home, and they are the only parents, that Child has ever known. Ms. Rose concluded that termination of Father's parental rights would not negatively impact Child and would, in fact, provide permanency to Child.

Father testified that he has lived with his grandmother in Wautoma, Wisconsin, for the past year, and is a trained chef. However, he suffered a serious car accident in February 2022 and lost his job as a result. He stated that he has not been able to work since the car accident due to his physical rehabilitation efforts and requires a medical release to get back to work, which

_____

[7] *Id.* at 18-19.

- 4 -

he has not yet received. Father further testified that, although he was aware in September 2017 that mother was pregnant, he learned of Child's birth from a Facebook post. He also stated that Mother would not respond to his efforts to reach her because "[a]s she would say, I abandoned her." N.T. TPR Hearing at 38. Father stated that although he had been addicted to drugs, he had been clean for two years but would not move back to Pennsylvania because it was where his drug addiction began and moving back "wouldn't be in the interest of me or [C]hild." *Id*. at 40-41. Father further testified that he knew Mother was a drug addict when they were together but stated that at no point did he try to reach out to the Agency to inquire about Child after learning of Child's birth. In fact, it was not until July 2021 when the Agency reached him that he began to inquire about Child's status. *Id*.

At the close of testimony, Child's GAL/legal counsel made a statement that it would be in Child's best interests, as well as in Child's legal interests, to terminate Father's parental rights.[8]

The court then terminated Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8) and (b). The court emphasized, among other things, that Child does not know Father and Father "has presented no reasonable plan for him to get to know [C]hild or to complete any of the services that would be required such that we could move [C]hild to his care

---

[8] **See id**. at 47-48 (where GAL/legal counsel opines it would be against Child's best interests to remove her from the only home and the only parents she has known in her entire life "minus eight days" and "presumes" that Child's legal interest would be to stay with her current "mommy and daddy.").

and custody, nor that that would occur within a reasonable time." N.T. TPR Hearing at 56. With respect to Section 2511(b), the court noted that it observed Child interact with the foster parents throughout the termination proceeding, and that "[i]t is extremely clear that she is bonded [with them], that she feels comfortable, that she is well taken care of, and that it would be extremely detrimental to uproot her from the only home she has ever known and move her across the country to live with a stranger who has not availed himself of the opportunities that he could have taken to come here and be more involved." *Id*. at 57.

Father timely appealed. Both Father and the trial court complied with Pa.R.A.P. 1925.

Father challenges the trial court's involuntary termination of his parental rights under subsections (1), (2), (5), and (8) of 23 Pa.C.S. § 2511(a). When we review a trial court's decision to grant or deny a petition to involuntarily terminate parental rights, we must accept the findings of fact and credibility determinations of the trial court if the record supports them. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id*. (citation omitted). "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (citation omitted). We may not reverse merely because the record could support a different result. *T.S.M.*, 71 A.3d at 267. We give great deference

to the trial courts "that often have first-hand observations of the parties spanning multiple hearings." *Id.* Moreover, "[t]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

Section 2511 of the Adoption Act, 23 Pa.C.S. § 2511, governs termination of parental rights, and requires a bifurcated analysis. "Initially, the focus is on the conduct of the parent." *In re Adoption of A.C.*, 162 A.3d 1123, 1128 (Pa. Super. 2017) (citation omitted). "The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a)." *Id.* (citation omitted). If the court determines that the parent's conduct warrants termination of his or her parental rights, the court then engages in "the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." *Id.* (citation omitted). Notably, we need only agree with the court's decision as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm the termination of parental rights. *In re K.Z.S.*, 946 A.2d 753, 758 (Pa. Super. 2008).

Appellant challenges the court's termination of his parental rights pursuant to Section 2511(a)(2). Section 2511(a)(2) provides for termination of parental rights where the petitioner demonstrates by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or

refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." 23 Pa.C.S. § 2511(a)(2); *In re Adoption of S.P.*, 47 A.3d 817, 827 (Pa. 2012). The grounds for termination of parental rights under Section 2511(a)(2) due to parental incapacity are not limited to affirmative misconduct; those grounds may also include acts of refusal as well as incapacity to perform parental duties. *In re N.A.M.*, 33 A.3d 95, 100 (Pa. Super. 2011). Thus, sincere efforts to perform parental duties may still be insufficient to remedy an incapacity. *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super 2010). This is because subsection (a)(2) "emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being," especially "where disruption of the family has already occurred and there is no reasonable prospect for reuniting it." *Id.* (citation and emphasis omitted).

In his brief, Father contends that after the Agency contacted him, he made "repeated requests for Interstate Compact investigation that would have assess[ed] his ability to serve as a parent to [] Child" but "that investigation never took place." Father's Br. at 9, 14.[9] Father also argues that "he testified

_____

[9] Although Father alleges that he asked the Agency to conduct an investigation under the Interstate Compact for the Placement of Children ("ICPC"), 62 P.S. § 761, the court found on April 21, 2022, that Father had not requested an ICPC investigation. *See* Permanency Review Order, 4/21/22, at 1. Father has
*(Footnote Continued Next Page)*

that he has housing, family support and employment in Wisconsin" and has complied with the terms of his probation, including treatment for domestic violence and substance abuse. *Id*. He concludes that the Agency did not show by clear and convincing evidence that he is incapable of parenting. *Id*.

In finding that the Agency met its burden under subsection (a)(2), the trial court concluded that, while the evidence showed Father had made some efforts toward establishing a connection with Child after being contacted by the Agency, "[t]here are many things Father could have done that he has not done." Trial Ct. Op., dated 8/11/22, at 8.

> This is not to question that Mother put up obstacles [to prevent Father's involvement in the dependency proceedings], that geography created an obstacle, or that he has [had] physical limitations in the past few months. But he has known that he had a child since the birth of [C]hild. A period of over two years. What is most concerning for the [c]ourt is that this child may have been in the care or he may have believed [C]hild to be in the care of Mother or someone, and even still took no steps to contact anyone in authority in York county to ensure the safety of the child to whom he owed a duty of care.

*Id.* at 8-9.

The court also noted its appreciation that Father "has stepped up" and found credible testimony that Mother herself put up some obstacles to prevent his involvement in the dependency proceedings. *Id*. at 5. The court

_____

not cited to a relevant portion of the record to support his assertion and our review of the dependency and adoption records reveals no such evidence exists. We further note that the ICPC explicitly does not apply to a legal parent bringing his or her child to another state to live with a relative or non-agency guardian. 62 P.S. § 761, Art. VIII(a).

nonetheless expressed that many of the obstacles that stopped Father from becoming involved in Child's life from the beginning were "of his own making." *Id*. at 5. The court noted case law holding that a parent must take the effort to maintain a place of importance in the child's life with good faith efforts and utilize all available resources to preserve a parental relationship while resisting obstacles placed in the path of the parent/child relationship. *See id.* at 5-6 (citing *In re: B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004)).

> In summary, being a parent is an affirmative responsibility. Notably, during the testimony, essentially at one point Father indicated that he was working on himself but [C]hild was in his mind. While we appreciate that he may love and care about [C]hild and that he was taking time to work on himself, a child is not in a deep freeze waiting for a more convenient time for him to be a parent. Given the circumstances, it is unreasonable for him to have continued to completely absent himself from Pennsylvania, even though his probation was out of Lancaster County, such that he could not even perform a paternity test, let alone anything else related to his parental duties.

*Id.* at 7-8.

Based on our review of the record, we conclude that the court's factual findings are supported by the record and the court did not abuse its discretion or err as a matter of law in involuntarily Father's parental rights pursuant to Section 2511(a)(2). As noted by the court, Father made no effort to find Child after learning of her birth and Father remained a stranger to Child at the time of the termination hearing. While he made some efforts to connect with Child after the Agency called him in July 2021, his efforts were minimum at best and did not show that he was utilizing all resources available to him and taking

affirmative steps to overcome his obstacles to institute a parent/child relationship where none had existed in Child's short life.

Accordingly, we affirm the Decree terminating Father's parental rights to Child.[10]

Decree affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/22/2022

---

[10] Father has not challenged the court's finding that the Agency had showed that termination was appropriate under 23 Pa.C.S. § 2511(b). Any issue he could have raised is, thus, waived. We nonetheless observe that the trial court's findings of fact regarding the lack of a bond between Child and Father and the strong bond Child has with her pre-adoptive family with whom she has lived her entire life are supported by the record. As the record supports the trial court's findings regarding Section 2511(b), we conclude that the court did not abuse its discretion or err as a matter of law determining that it would be in Child's best interests to terminate Father's parental rights.